DECISION IN MANDAMUS ON OBJECTIONS TO MAGISTRATE'S DECISION
{¶ 1} mandamus In this original action, relator, Charles W. Harner, requests a writ of ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him permanent total disability ("PTD") compensation and enter an order granting said compensation.
 {¶ 2} Relator was employed as a laborer by respondent, McKesson Corporation ("McKesson"), a self-insured employer. On October 18, 1999, relator sustained an industrial injury in the course of his employment. Claim No. 99-583758 is allowed for:
 BLUNT TRAUMA RIGHT UPPER EXTREMITY; RIGHT ROTATOR CUFF TEAR; TYPE II SLAP LESION RIGHT SHOULDER; MAJOR DEPRESSION; RIGHT BICEPS TENDONITIS; RIGHT ROTATOR CUFF TENDONITIS; RIGHT ADHESIVE CAPSULITIS; RIGHT SHOULDER IMPINGEMENT SYNDROME; RIGHT LABRAL TEAR; AND RIGHT SHOULDER SPRAIN/STRAIN.
 {¶ 3} On October 20, 2004, relator applied for PTD compensation and submitted a report completed by psychiatric consultant, Edward F. Hackett, Jr., M.D., in support of his claim. Dr. Hackett indicated that relator's psychiatric condition prevented him from entering the workforce at that time, but that he did have hope that relator's condition would improve.
 {¶ 4} On November 30, 2004, relator was examined by David C. Randolph, M.D., at McKesson's request. Dr. Randolph noted that he examined relator for all allowed physical claims, but failed to address relator's conditions of right biceps tendonitis and right adhesive capsulitis. Dr. Randolph stated:
 * * * It is my opinion [that relator] is capable of lifting and carrying objects weighing up to 20 pounds in the mid range. Based upon the conditions allowed in this claim he would have no restrictions with respect to sitting, standing, walking, bending, twisting, or stooping.
 {¶ 5} On December 10, 2004, relator was examined by psychiatrist Richard H. Clary, M.D., at McKesson's request. Dr. Clary assessed relator's allowed psychiatric condition at five percent whole person impairment. Dr. Clary concluded that relator's condition did not prevent him from engaging in sustained remunerative employment.
 {¶ 6} At the commission's request, relator was examined by Robin G. Stanko, M.D., and psychiatrist Donald L. Brown, M.D., on February 17, 2005. Dr. Stanko examined relator for all allowed physical conditions and stated:
 * * * I feel the claimant could perform work at light work levels, that is lifting up to 20 pounds overall, but lifting limited to 10 pounds in the right upper extremity with no overhead reaching or lifting.
Dr. Stanko indicated on the Physical Strength Rating form that relator is capable of "light work." Dr. Stanko also included a handwritten notation under the definition of "light work" reiterating the caveat in his report that relator's work activities should be restricted to "10 lbs lifting with right arm and no overhead lifting with right arm."
 {¶ 7} Dr. Brown opined that relator's allowed condition of major depression had reached maximum medical improvement. Dr. Brown further rated relator's depression at a moderate level of 25-28 percent. Dr. Brown submitted an Occupational Activity Assessment in which he concluded that relator is able to return to his former position of employment and is able to perform any sustained remunerative employment.
 {¶ 8} On May 3, 2005, vocational expert John Finnegan completed a vocational report at the request of McKesson. Finnegan relied upon the physical reports submitted by Drs. Stanko and Randolph and concluded that, "[b]ased on the medical evidence in the file, it is reasonable to assume a residual functional capacity for employment within the light range with no overhead reaching or lifting." Given the restrictions imposed by Dr. Stanko, Finnegan opined that relator was capable of employment as a "Toll Collector," "Cashier II," "Parking Lot Attendant," and "Surveillance System Monitor."
 {¶ 9} On June 10, 2005, a staff hearing officer ("SHO") conducted a hearing on relator's claim for PTD. The commission noted that relator is 42 years old and, although he left school after the eighth grade, he obtained a GED in 1992. Relying upon the reports issued by Drs. Randolph, Stanko, Brown, and Clary, and Finnegan's vocational report, the SHO found that "the injured worker retains the residual physical, psychological and intellectual capacities to engage in unskilled light to sedentary employment." The SHO issued an order denying relator's request for PTD.
 {¶ 10} On January 9, 2006, relator filed the within mandamus action. We referred the case to a magistrate of this court pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth Appellate District. The magistrate issued a decision, complete with findings of fact and conclusions of law and recommended that this court deny relator's requested writ of mandamus. (Attached as Appendix A.) McKesson conceded and the magistrate held that the commission could not rely upon Dr. Randolph's report because he did not examine relator for all of relator's allowed physical claims. The magistrate further concluded that the commission properly relied upon Dr. Stanko's physical report and Finnegan's vocational report to deny relator's request for PTD.
 {¶ 11} Relator objects to the magistrate's decision on two grounds. He first claims that the magistrate erred in holding that Dr. Stanko properly included a written notation further restricting the "light work" relator was able to perform. Relator contends that Dr. Stanko's "unilateral alteration violates the definition of `light work' administratively drafted through the rule-making process." (Relator's Objections, at 1.) Relator further argues that Finnegan's vocational report was flawed because Finnegan based his vocational assessments on the reports issued by Drs. Randolph and Stanko. As such, the commission abused its discretion when it relied upon Finnegan's report to deny relator PTD compensation. For the following reasons, we overrule relator's objections.
 {¶ 12} In order to be entitled to a writ of mandamus, relator must show that he has a legal right to relief from the determination of the commission and that the commission has a legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm. (1967),11 Ohio St.2d 141. Relator must show that the commission abused its discretion by entering an order that is not supported by the evidence of record.State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. However, where some evidence supports the commission's order there was no abuse of discretion and mandamus will not lie. State ex rel. Lewis v. DiamondFoundry Co. (1987), 29 Ohio St.3d 56.
 {¶ 13} In his first objection, relator asserts that Dr. Stanko improperly added physical restrictions, thus changing the definition of "light work" as provided by Ohio Adm. Code 4121-3-34(B)(2)(b).[1] Under the code, "light work" means:
 * * * [E]xerting up to twenty pounds of force occasionally, and/or up to ten pounds of force frequently, and/or a negligible amount of force constantly * * * to move objects. Physical demand may be only a negligible amount, a job should be rated light work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling or arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.
Relator contends that the opinions of examining physicians must strictly conform to the classifications of physical demands set forth in Ohio Adm. Code 4121-3-34(B)(2) and that they are not allowed to render opinions as to injured claimants' residual capacities in light of the definitions. Relator suggests that the restrictions imposed by Dr. Stanko bring relator's abilities below the definition of "light work."
 {¶ 14} Although the restrictions imposed by Dr. Stanko indicate that relator is capable of work that would fall within the lower end of capabilities under the "light work" definition, the restrictions clearly do not render him unable to perform sustained remunerative employment. Moreover, it is not uncommon for physicians to include the extent of claimants' residual functional abilities in their reports. Dr. Stanko's notation provides nothing more than a clarification of relator's work abilities pursuant to the definition of "light work" under Ohio Adm. Code4121-3-34(B)(2)(b). Accordingly, Dr. Stanko's report constitutes some evidence upon which the commission could rely when it concluded that relator is able to perform light sedentary work.
 {¶ 15} In his second objection, relator contends Finnegan's vocational report may not be considered because Finnegan cited the reports given by Drs. Randolph and Stanko. This court has already held that removal of a report from consideration by the commission for PTD compensation does not mean the commission abused its discretion where there is other evidence to support the commission's order. State ex rel. McEndre v.Indus. Comm., Franklin App. No. 01AP-1013, 2002-Ohio-3503; State ex rel.Wheeling-Pittsburgh Steel Corp. v. Indus. Comm., Franklin App. No. 05AP-913, 2006-Ohio-3912. While the parties concede that Dr. Randolph's report was defective and could not be considered, Dr. Stanko's report is not defective. We agree with the magistrate's conclusion that vocational expert Finnegan was entitled to rely upon Dr. Stanko's report in reaching his vocational decision and that the report was some evidence that relator is capable of sustained remunerative employment.
 {¶ 16} Based upon the foregoing, we overrule relator's objections. The commission properly relied upon some evidence to reach the conclusion that relator is not entitled to PTD compensation. Accordingly, we adopt the magistrate's decision. Relator's request for a writ of mandamus is denied.
Objections overruled;
 writ of mandamus denied.
PETREE and KLATT, JJ., concur.
 (APPENDIX A) MAGISTRATE'S DECISION IN MANDAMUS {¶ 17} In this original action, relator, Charles W. Harner, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him permanent total disability ("PTD") compensation and to enter an order granting said compensation.
Findings of Fact:
 {¶ 18} 1. On October 18, 1999, relator sustained an industrial injury while employed as a laborer for respondent, McKesson Corporation, a self-insured employer under Ohio's Workers' Compensation laws. On that date, relator "pulled" his right arm and shoulder as he attempted to prevent a heavy box from falling.
 {¶ 19} 2. The industrial claim is assigned Claim Number 99-583758, and is allowed for:
 BLUNT TRAUMA RIGHT UPPER EXTREMITY; RIGHT ROTATOR CUFF TEAR; TYPE II SLAP LESION RIGHT SHOULDER; MAJOR DEPRESSION; RIGHT BICEPS TENDONITIS; RIGHT ROTATOR CUFF TENDONITIS; RIGHT ADHESIVE CAPSULITIS; RIGHT SHOULDER IMPINGEMENT SYNDROME; RIGHT LABRAL TEAR; AND RIGHT SHOULDER SPRAIN/STRAIN.
and is assigned Claim Number 99-583758.
 {¶ 20} 3. On October 20, 2004, relator filed an application for PTD compensation. In support, relator submitted a report, dated August 11, 2004 from Edward F. Hackett, Jr., M.D., who is a psychiatric consultant. Dr. Hackett's report states:
 I've seen Mr. Harner six times dating back to September 29, 2003 and am seeing him approximately every six to seven weeks. I reviewed his history, discussed the case with his case manager here who also meets with him on a regular basis, and in spite of what I would describe as fairly intensive treatment, including medication for nerves and depression, he continues to be quite symptomatic with major depression remaining at a high level, a feeling of hopelessness, perception of self as a burden to his family, and being in pain and grouchy 80% of the time. * * * He additionally has multiple medical problems, including metabolic and pain for which he is on pain medication with only fair results at best.
 In summary, I see him as doing fairly poorly and while I don't give up hope that there will be improvement, I would say the likelihood that he will be able to re-enter the work force in a competitive manner is extremely low.
 {¶ 21} 4. On November 30, 2004, at the employer's request, relator was examined by David C. Randolph, M.D., who wrote:
 His history dates to 10/18/99 when he sustained an industrial injury with allowed conditions of "blunt trauma right upper extremity, right rotator cuff tear, Type II SLAP lesion right shoulder, major depression, right biceps tendonitis, right shoulder impingement syndrome, right labral tear, right shoulder sprain/strain. It is noted that the claimant was evaluated with respect to all of his allowed physical conditions, not the condition of "major depression".
 If this claimant were so motivated he could return to work activities with avoidance of forceful or overhead use involving his right upper extremity. It is my opinion he is capable of lifting and carrying objects weighing up to 20 pounds in the mid range. Based upon the conditions allowed in this claim he would have no restrictions with respect to sitting, standing, walking, bending, twisting, or stooping.
 It is my opinion based upon the history, physical examination and review of provided records, that if motivated, this claimant is certainly capable of returning to work activities. His absent from work in my opinion is based upon factors, issues and clinical problems outside of those physical conditions allowed in this claim and not associated with the events housed within the confines of the instant claim.
 {¶ 22} 5. On December 10, 2004, at the employer's request, relator was examined by psychiatrist Richard H. Clary, M.D. Dr. Clary wrote:
 In my medical opinion, the allowed psychiatric condition results in a permanent partial impairment of 5 percent of the whole person based on the AMA Guides Fifth Edition. In my medical opinion, the psychiatric allowance is not work prohibitive.
 {¶ 23} 6. On February 17, 2005, at the commission's request, relator was examined by Robin G. Stanko, M.D., who specializes in physical medicine and rehabil-itation. In his report, Dr. Stanko correctly listed all the allowed conditions of the claim. He wrote:
 From my examination and review of the file including treatments rendered for this condition, it is my opinion that this claimant has reached maximal medical improvement and that the condition has become permanent. Based on the AMA Guides to the Evaluation of Permanent Impairment, Fourth Edition, in my opinion, the claimant has a permanent impairment of 11% whole person using Table 3 (page 20), Figure 38 (page 43), Figure 41 (page 44), and Figure 44 (page 45). I feel the claimant could perform work at light work levels, that is lifting up to 20 pounds overall, but lifting limited to 10 pounds in the right upper extremity with no overhead reaching or lifting.
 {¶ 24} 7. On February 17, 2005, Dr. Stanko completed a Physical Strength Rating form. On the form, Dr. Stanko indicated by checkmark that relator is capable of "light work." Underneath the pre-printed definition of "light work," Dr. Stanko wrote:
 10 lbs lifting with right arm and no overhead lifting with right arm.
 {¶ 25} 8. On February 17, 2005, at the commission's request, relator was examined by psychiatrist Donald L. Brown, M.D., who wrote:
 In my opinion, Mr. Harner has reached MMI with respect to his previously allowed major depression. It can be seen as permanent. Utilizing the 4th Edition of the AMA Guidelines to the Determination of Permanent Impairment, I'd rate him as having a Class III level of impairment. This is a moderate level of impairment. Referencing the percentages from the 2nd Edition in the 4th Edition, I would rate his impairment at 25-28%.
 {¶ 26} 9. Dr. Brown also completed an Occupational Activity Assessment form dated February 17, 2005. The form asks the examining psychiatrist the following two-part query:
 Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this injured worker meet the basic mental/behavioral demands required:
 [1] To return to any former position of employment?
 [2] To perform any sustained remunerative employment?
 Dr. Brown responded "yes" to both queries.
 {¶ 27} 10. The employer requested a vocational report from John Finnegan, who is a vocational expert. In his report, dated May 3, 2005, Finnegan provided an "employability opinion" based upon the report of Dr. Stanko. Finnegan listed job titles that relator "may reasonably be expected to perform immediately, following appropriate academic remediation, or brief skill training." Among the job titles listed are "Toll Collector," "Cashier II," "Parking Lot Attendant," and "Surveillance System Monitor."
 {¶ 28} The Finnegan report further states:
 {¶ 29} III. Impact of Other Employability Factors:
 1. The claimant's ability to meet the basic demands of entry-level occupations is described as follows:
 Age: The claimant's age, 42, a younger person, is a positive factor in his ability to meet the basic demands of entry-level jobs.
 Education: The claimant has an 8th grade education (1975) and obtained a GED in 1992. This is a positive factor in his ability to meet the demands of entry-level jobs.
 Work History: The claimant began work in 1985 and worked until 2000. He worked at various jobs and demonstrated the ability to meet the demands of entry-level jobs.
 2. Based on a review of the background data, the claimant demonstrates the following abilities to develop academic or other skills required to perform entry level jobs at the Light physical demand level(s):
 The claimant's background demonstrates the ability to develop academic and other skills required to perform entry level light jobs. He obtained a GED in 1992. He also demonstrated the ability to learn a semi-skilled job as a material handler, which entailed operating a table saw and a cherry picker.
 {¶ 30} 11. Following a June 10, 2005 hearing, a Staff Hearing Officer ("SHO") issued an order denying relator's PTD application. The SHO's order states:
 Is it (sic) the finding of the Staff Hearing Officer that the injured worker retains the residual physical, psychological and intellectual capacities to engage in unskilled light to sedentary employment. Therefore, his application for permanent and total disability is denied. In finding that the injured worker has the ability to engage in sustained remunerative employment, the Staff Hearing Officer relies upon the medical reports of Dr. David Randolph, M.D., dated 12/19/2004, Dr. Robin Stanko, M.D., dated 02/17/2005, Dr. Donald Brown, M.D., dated 02/17/2005, and Dr. Richard Clary, M.D., dated 12/13/2004 and the vocational evaluation of Mr. John Finnegan, M.Ed., dated 05/03/2004.
 The injured worker is a 42 year old man who completed the 8th grade in 1975 but later earned a G.E.D. in 1992. The record does not reveal that the injured worker attended any vocational school or training program. Prior to leaving the work force at the age of 37, the record reveals that the injured worker has experience as an order filler, assembly worker, lumber yard man, and builder of curved stairs/laborer.
 The record reveals that the injured worker sustained an injury on 10/18/1999 when a case he was picking up, fell and hit his arm as he grabbed it.
 The claim is allowed for the conditions noted in this order. The injured worker has had several arthroscopic surgeries to repair the slap lesion in his right shoulder. He has also had manipulation of his shoulder with injection under anesthesia. The record shows that the injured worker sees Dr. Hackett for psychiatric counseling every six weeks.
 On 02/17/2005, Dr. Robin Stanko, M.D. (physical medicine and rehabilitation) examined the injured worker on behalf of the Industrial Commission to determine whether the injured worker retains the residual physical capacity to engage in sustained remunerative employment. He found that the injured worker has decreased range of motion with his right shoulder. He found that the injured worker had reached maximum medical improvement and that the injured worker had 11 percent whole person impairment. He opined that the injured worker retained the residual physical capacity to perform light work. The injured worker is capable of lifting up to 20 pounds but limited to lifting of 10 pounds with the right upper extremity and no overhead reaching or lifting.
 On 02/17/2005, Dr. Brown, M.D. (psychiatrist) examined the injured worker on behalf of the Industrial Commission to determine whether the injured worker retains the residual psychological capacity to engage in sustained remunerative employment. He opined that the injured worker's psychological condition did not prevent the injured worker from returning to his former position of employment. He opined that the injured worker had 28 percent impairment.
 On 12/13/2004, Dr. Clary (psychiatrist) examined the injured worker on behalf of the employer to determine whether the injured worker retains the residual psychological capacity to engage in sustained remunerative employment. He opined that the injured worker retains the residual psychological capacity to return to his former position of employment. He also found that the injured worker had 5 percent whole person impairment as of the result of the allowed psychological condition.
 On 11/30/2004 (report dated 12/19/2004), Dr. Randolph examined the injured worker on behalf of the employer to determine whether the injured worker retains the residual physical capacity to engage in sustained remunerative employment. He opined that the injured worker retains the residual physical capacity to lift and carry objects weighing 20 pounds, and has no restrictions with respect to sitting, standing and walking, bending, stopping (sic) or twisting. He has the ability to return to work activities.
 Mr. Finnegan prepared an employability assessment report on behalf of the employer. In a report dated 05/03/2005, Mr. Finnegan found that the injured worker's age is a positive factor in finding employment; that the injured worker's education (G.E.D.) is sufficient to meet the demands of entry level work; and that the injured worker's various jobs demonstrated meet the demands of entry level employment. Using the residual physical restrictions noted in Dr. Stanko's medical report, Mr. Finnegan found that the injured worker could perform the job duties of toll collector, cashier, parking lot attendant, and surveillance system monitor.
 The Staff Hearing Officer finds that the injured worker has retained the attributes necessary to obtain entry-level employment if he so desires. The injured worker has the ability to read, write, and perform basic math. He has demonstrated the ability to learn new task by performing various employment positions prior to leaving the work force at age 37. He retains the residual physical capacity to return to light sedentary employment. He retains the residual psychological capacity to return to his former position of employment. The Staff Hearing Officer finds that the injured worker could seek employment positions as noted in [the] vocational assessment. The Staff Hearing Officer also finds that the injured worker could seek employment as a video clerk, dry cleaner clerk, and telemarketer.
 The Staff Hearing Officer also notes that since leaving the work force at the age of 37, the injured worker has never attempted to return to any type of employment or seek out social service agencies that would have helped him seek employment or become more marketable to return to the work force. The Staff Hearing Officer finds that the injured worker has an obligation to explore other possibilities for employment. Permanent and total disability is the last resort, not the first. It is for the reasons noted that the application is denied.
 {¶ 31} 12. On January 9, 2006, relator, Charles W. Harner, filed this mandamus action.
Conclusions of Law:
 {¶ 32} Three issues are presented: (1) whether the commission can rely upon Dr. Randolph's opinion that relator has the physical ability to return to work activities when Dr. Randolph failed to examine for all the allowed physical conditions of the claim, (2) whether the commission can rely upon Dr. Stanko's opinion regarding relator's ability to work when Dr. Stanko imposed restrictions in addition to those contained in the definition of light work, and (3) whether the commission can rely upon that portion of Finnegan's report that the commission relied upon in its order.
 {¶ 33} The magistrate finds: (1) as the employer here concedes, the commis-sion cannot rely upon Dr. Randolph's opinion, (2) the commission can rely upon Dr. Stanko's opinion, and (3) the commission can rely upon that portion of Finnegan's report that the commission relied upon.
 {¶ 34} Accordingly, as more fully explained below, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 {¶ 35} Turning to the first issue, it is settled that the commission must consider all the claimant's allowed conditions in determining his application for PTD compensation. State ex rel. Johnson v. Indus.Comm. (1988), 40 Ohio St.3d 384; State ex rel. Cupp v. Indus. Comm.
(1991), 58 Ohio St.3d 129.
 {¶ 36} In the initial paragraph of his 12-page report, Dr. Randolph lists the allowed conditions of the claim. There is no dispute here that Dr. Randolph failed to list "right rotator cuff tendonitis" and "right adhesive capsulitis."
 {¶ 37} Under a section of the report captioned "Medical Records," Dr. Randolph notes at page seven that in a February 18, 2002 report from Mark Gittens, D.O., there is a diagnosis of adhesive capsulitis. However, there is no indication in Dr. Randolph's report that Dr. Randolph believed that adhesive capsulitis is an allowed condition of the claim. The commission suggests here that this court can determine that Dr. Randolph believed that adhesive capsulitis is an allowed condition even though he failed to list "right adhesive capsulitis" as an allowed condition of the claim. The magistrate disagrees.
 {¶ 38} In a supplemental stipulation of evidence, the commission submitted the December 16, 2003 report of Peter E. Johnston, D.O., which the commission claims correctly lists all the allowed conditions of the claim. At page nine of his report under his medical records review, Dr. Randolph mentions Dr. Johnston's report as among the medical records he reviewed. According to the commission here, because Dr. Johnston allegedly lists all of the claim allowances, this court can infer that Dr. Randolph was aware of all the claim allowances and examined claimant for them. The magistrate disagrees.
 {¶ 39} In the view of this magistrate, respondent McKesson Corporation correctly concedes in its brief that Dr. Randolph's report cannot be relied upon by the commission to support its decision to deny this PTD application.
 {¶ 40} Accordingly, the magistrate finds that Dr. Randolph's report should have been removed by the commission from evidentiary consideration given that the report strongly suggests that Dr. Randolph was unaware of two allowed physical conditions of the claim.
 {¶ 41} Turning to the second issue, Ohio Adm. Code 4121-3-34 sets forth the commission's rules for the adjudication of PTD applications. Ohio Adm. Code 4121-3- 34(B) sets forth applicable definitions and states that those definitions "shall apply to the adjudication of all applications * * *." Ohio Adm. Code 4121-3-34(B)(2) states in part:
(2) Classification of physical demands of work:
 (a) "Sedentary work" means exerting up to ten pounds of force occasionally (occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.
 (b) "Light work" means exerting up to twenty pounds of force occasionally, and/or up to ten pounds of force frequently, and/or a negligible amount of force constantly (constantly: activity or condition exists two-thirds or more of the time) to move objects. Physical demand may be only a negligible amount, a job should be rated light work: (1 ) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling or arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.
 {¶ 42} According to relator, the commission rules prohibit a doctor from opining as to the claimant's residual functional capacity by adding restrictions to one of the work classifications. Following the logic of relator's argument, presumably relator would argue that a doctor is only permitted to opine as to which work classification, if any, is applicable to the claimant's injury. The magistrate disagrees with relator's argument.
 {¶ 43} To begin, the language of the rule stating that the definitions "shall apply to the adjudication of all applications * * *" does not compel the conclusion that relator posits here. In actuality, the rule itself is silent as to the question posed by relator.
 {¶ 44} As a practical matter, there is no reason why an examining doctor should not be permitted to describe the claimant's residual functional capacity as accurately as he can do it. Here, Dr. Stanko apparently felt that the "light work" classification most closely fits claimant's actual residual functional capacity and, with the additional restrictions of the right upper extremity, aptly describes claimant's residual functional capacity.
 {¶ 45} Moreover, as a practical matter, Dr. Stanko's additional restrictions do not appear to have created any confusion on the part of Mr. Finnegan or the commission. Mr. Finnegan duly noted Dr. Stanko's additional restrictions in his report and the SHO duly noted the additional restrictions in the order. Under such circumstances, it is difficult to see how relator can claim that he was prejudiced by Dr. Stanko's approach to describing his residual functional capacity.
 {¶ 46} In short, Dr. Stanko's report is indeed some evidence upon which the commission can and did rely.
 {¶ 47} As previously noted, the third issue is whether the commission can rely upon that portion of Finnegan's report that the commission relied upon. It is important to note that the SHO relied specifically upon that portion of Finnegan's report that presents vocational opinions based upon Dr. Stanko's report. Because Dr. Stanko's report withstands relator's challenge here, Finnegan's vocational opinions based on Dr. Stanko's report are presumptively valid. Thus, relator's claim that the flawed report of Dr. Randolph necessarily flaws the commission's reliance upon Finnegan's report lacks merit.
 {¶ 48} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
KENNETH W. MACKE MAGISTRATE
[1] We note that relator only objects to the restriction in its handwritten form on the Physical Strength Rating form. Relator does not object to the identical restriction Dr. Stanko included in his report.